```
            IN THE UNITED STATES BANKRUPTCY COURT
           FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
                         DURHAM DIVISION

IN RE:                         )
                               )
MAPLES PROPERTIES, INC.        )   CASE NO. 04-81593C-7D
                               )
     Debtor.                   )
```

<u>MEMORANDUM OPINION</u>

Sara A. Conti, the Chapter 7 Trustee for Maples Properties, Inc., (the "Debtor") filed a motion for summary judgement on 25 claims filed against the Debtor's estate, having an approximate combined value of $337,000. The claims arise out of the Debtor's operation of a club consisting of a golf course and related amenities in Moore County, North Carolina. The claimants, members of the club operated by the Debtor, seek a return of payments made to the Debtor for allegedly excessive club dues, allegedly unauthorized dining room minimums, and for membership fees.

The court held a hearing in this case on December 8, 2005, in Durham, North Carolina, at which time the court took the matter under advisement. For the reasons stated below, the court will grant in part and deny in part the Trustee's motion for summary judgment.

STANDARD OF REVIEW

Summary judgment is appropriate when the matters presented to the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056; <u>Celotex v.</u>

Catrett, 477 U.S. 317, 322 (1986).  The party moving for summary judgment has the initial burden of proving that there is no genuine issue as to any material fact.  Adickes v. S. H. Kress & Co., 398 U.S. 144, 161 (1970).  Once the moving party has met this initial burden of proof, the non-moving party must set forth specific facts sufficient to raise a genuine issue for trial, and may not rest on its pleadings or mere assertions of disputed facts to defeat the motion.  Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (stating that the party opposing the motion "must do more than simply show that there is some metaphysical doubt as to the material facts").  The mere existence of a scintilla of evidence in support of the opposing party's position will not be sufficient to forestall summary judgment, but "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 252 (1986).  In ruling on a motion for summary judgment, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

                              BACKGROUND

     On December 17, 1987, Dan F. Maples – the predecessor in interest to the Debtor – purchased a 310-acre tract of land in Moore County, North Carolina.  Mr. Maples set aside 170 acres of that larger tract, designating it for use as a golf course, and

clubhouse with support facilities and amenities (the "Club Property").  The remaining 140 acres were designated for residential development.  Longleaf Associates Limited Partnership ("Longleaf") was to sell the residential lots.  The sale of each lot included a membership fee, the payment of which entitled the owner of the lot to be a member of the Club.

On March 23, 1990, Longleaf and the Debtor executed a new contract.  The Debtor agreed to convey to Longleaf an alienable easement of enjoyment (the "Easement") burdening the Club Property, which could then be conveyed as an appurtenant grant in the conveyance of all the authorized residential units on the developed land.  The Easement granted the owners of the residential units the right to be a "member" of the Club at Longleaf, although the right to use or enjoy membership privileges was to be conditioned on an individual member remaining in good standing with the Club.  The Easement was recorded on March 23, 1990.[1]  Concomitant with the

---

[1] The Easement states:
   Maples hereby grants unto Longleaf and its successors and assigns in and to a maximum of six hundred eighteen (618) residential units and condominium units . . . an alienable easement of enjoyment for use of the Club Property . . . for the purpose for which use thereof has been limited as provided in the Declaration but subject to the limitation of exercise of the rights thereunder as hereinafter set forth, which easement shall be appurtenant to and shall run forever with the title to the first six hundred eighteen (618) Longleaf Residences . . . .
   Exercise of the rights under this Easement of Enjoyment by the owner or owners of any Longleaf Residence to which this Easement of Enjoyment is

execution of the Easement, the parties also executed a declaration (the "Declaration") stating that the Club Property would be held in perpetuity as a golf club with related amenities.[2]  Longleaf and the Debtor also agreed – consonant with the rights and duties granted in the Easement and the Declaration – to an initial set of rules and regulations (the "Rules").

The Debtor completed the construction of the golf course, clubhouse and other facilities contemplated for the Club Property and thereafter operated a club on the property known as the Club at Longleaf.  Development of the residential property was pursued by Longleaf and its successors and residential lots were sold and

---

    appurtenant shall be limited to those who from time to time are members in good standing of the golf club provided for in the Declaration. . . .

[2] The Declaration states:
    Maples hereby declares that the Club Property is held presently by Maples and shall be held in perpetuity by Maples, its successors and assigns, subject to a limitation of use in perpetuity as a golf club with related amenities, which may include, without limitation, a regulation eighteen (18) hole golf course, club house, tennis courts, swimming pool, golf shop, pro shop, driving range, practice putting green, parking and related support facilities for the maintenance, passage, irrigation and drainage, and membership to which shall be limited to seven hundred three (703) individual memberships . . . which memberships shall be subject to transfer fees, user fees and rules and regulations adopted from time to time. . . .
    [T]his Declaration may be amended from time to time by mutual agreement of Maples and Longleaf and/or the respective successors and assigns of Maples and Longleaf without the joinder of any such owner or owners. . . .

homes built on the property.  The claimants are property owners and residents in the development and were members of the Club at Longleaf while it was operated by the Debtor.

On May 26, 2004, the Debtor filed for relief under Chapter 11 of the Bankruptcy Code.  On October 24, 2004, the court entered an order approving the Debtor's rejection of the March 23, 1990 contract between the Debtor and Longleaf and the rejection of the Rules.  As stated in the court's order, the Club at Longleaf did not have a sufficient membership base and was unable to generate the revenue necessary to sustain itself as a business.[3]  In particular, the Rules were burdensome to the estate in that the Debtor was unable to adequately adjust membership privileges, revise the dues structure, or market memberships in a competitive manner.  Both the Rules and the March 23, 1990 contract were rejected by the Debtor to increase the sale value of the property.  On November 24, 2004, in connection with a declaratory judgment action filed by the Debtor, this court entered an order adjudging that the Rules constituted an executory contract between the Debtor and the Club members within the meaning of section 365 of the Bankruptcy Code.  The court also declared that the Debtor, as the owner of the Club at Longleaf, could adopt dues, fees, or other charges for its members as it may from time to time determine – in

---

[3] When the Debtor filed its bankruptcy petition on May 26, 2004, approximately 253 residential units had been conveyed by Longleaf to third parties.

its sole discretion. Any member who did not elect to enjoy the right of Club membership was not required to abide by the Rules.

On December 6, 2005, the Club property, with court approval, was sold by public sale to Longleaf Florida, LLC for $2,400,000.[4] One condition of that transfer was that any owner of a residential unit automatically be a member with the right to use the Club Property pursuant to the Easement and the Declaration. Although Longleaf Florida is free to adopt such dues, fees, or other charges for resident and non-resident members as it may determine, no member may be required to pay any initiation or transfer fee based on the transfer of the property.

## ANALYSIS

The Trustee objects to the allowance of the 25 claims filed by resident members of the Club at Longleaf to the extent that those claims state that the Debtor owes money for the overpayment of dues, unauthorized dining room minimum charges, and for membership fees.

A. Overpayment of Dues

The claimants assert in their claims that the dues assessed by the Debtor were not assessed in accordance with Rules and that the Debtor imposed increases in the dues that were unauthorized and excessive. The Rules authorized the Debtor to impose and collect

---

[4] The Debtor stated that it had approximately $1,500,000 in secured debt; thus, there will be a dividend paid to unsecured creditors of the Debtor's estate.

dues. The Rules were authorized by the grant of authority to the Debtor in the Easement and the Declaration filed in the Moore County records and constituted a personal covenant between the members and the Debtor. See Page v. Bald Head Ass'n, 611 S.E.2d 463, 466 (N.C. Ct. App.) (treating the obligation to pay dues to a homeowner's association the same as any other contractual relationship), review denied, 616 S.E.2d 542 (N.C. 2005). A breach of the Rules thus is tantamount to a breach of contract and may give rise to a claim for damages resulting from such a breach.

Regarding the amount of dues payable by members who wished to remain in good standing, the Rules stated:

> Dues . . . are established and payable, in advance, on such basis as determined from time to time by the Club. The amount of dues and fees for subsequent years is subject to change. Such changes, however, must be based on an annual budget developed by the Club ("Annual Budget") and must be directly related to the cost experience of the Club in maintaining the Club Facilities in a first class manner.
> . . . .
> The payment of the applicable . . . fees, dues . . . and other charges that the Club may establish from time to time, are required to acquire and maintain Membership privileges.

Pursuant to the foregoing provision, the Debtor maintained the discretion to raise or lower dues as it saw fit, limited only by the adoption of an annual budget by the Club and a requirement that changes be directly related to the cost of maintaining and operating the Club Facilities in a first class manner.

In their claims, the claimants assert that there were

increases in dues that were not based upon an annual budget or related to the cost of maintaining and operating club facilities in a first class manner. As a part of their claim, the claimants allege that the Debtor exceeded the scope of its authority and abused its discretion by assessing dues for the purpose of subsidizing a for-profit restaurant that should not have been a part of the club facilities. It is undisputed that the dues were increased by the Debtor at various times prior to the filing of this case. The circumstances and basis for such increases are not fully developed and remain unclear from the record. The skeletal affidavit submitted by the Debtor in support of the motion for summary judgment is disputed by the affidavit submitted by the claimants. As a result, the record now before the court simply is insufficient for the court to conclude as a matter of law that the increases in dues were made in compliance with the applicable provisions of the Rules. Resolution of whether dues were assessed pursuant to annual budgets based on the cost-experience of maintaining and operating the Club Facilities in a first class manner, and whether the Easement, Declaration, or Rules authorized the operation of the restaurant operated by the Club and the use of dues to subsidize the restaurant involve material factual issues that are not properly resolved by means of summary judgment based upon the record now before the court.

(1) Quasi Estoppel

The Debtor also argues, however, that it is entitled to a judgment as a matter of law based on the doctrine of quasi estoppel because all of the complaining members have accepted the benefits offered by the Club in exchange for the payment of their dues.

Quasi estoppel, or estoppel by acceptance of benefits, occurs "[w]here one having the right to accept or reject a transaction or instrument takes and retains benefits thereunder, he ratifies it, and cannot avoid its obligation or effect by taking a position inconsistent with it." Redevelopment Comm'n of Greenville v. Hannaford, 222 S.E.2d 752, 754 (N.C. Ct. App. 1976). Quasi estoppel, however, is an equitable remedy, meaning that it is a tool used by a court to intervene where injustice would otherwise result. Swan Quarter Farms, Inc. v. Spencer, 514 S.E.2d 735, 738 (N.C. 1999). Also, one traditional equitable maxim is that one must come into equity with clean hands. E.g., Branch Banking & Trust Co. v. Gill, 211 S.E.2d 327, 342 (N.C. 1975), on reconsideration, 237 S.E.2d 21 (N.C. 1977).

The Debtor cites two cases in support of its quasi estoppel argument, both of which are inapposite because neither one involves breach of contract claims. In Hannaford, 222 S.E.2d 752, the court addressed a land ownership dispute between a decedent's heirs and held that the terms of a consent decree executed forty-five years earlier between the decedent and her former spouse governed the

disposition of the property because all interested parties had conformed their conduct to the terms of that decree.  Because the parties had a right to accept or reject the terms of the consent decree when it was negotiated, and because the parties had accepted the benefits of the consent decree for a period of forty-five years, the parties were estopped from taking an inconsistent position.  Id. at 753.  Hannaford did not involve any allegation that a party had breached the terms of the consent decree – it was a dispute over ownership of real property.

In Carolina Medicorp, Inc. v. Forsyth Memorial Hosp., Inc., 456 S.E.2d 116, 120-21 (N.C. Ct. App. 1995), the court determined that a valid contract between the parties existed, but stated in dicta that even if a contract did not exist, Forsyth Memorial Hospital was bound by the agreement it made with Carolina Medicorp because the Hospital choose to receive the benefits of a preferred provider agreement, which enabled it to retain members of the Carolina Medicorp health plan as customers.  Quasi estoppel was applicable to the dispute between the parties because after having received the benefits of being a preferred provider, the hospital could not shuck the corresponding burdens.  Id. at 121.  Unlike the case presently before the court, Forsyth Memorial Hospital did not argue that Carolina Medicorp breached the terms of the preferred provider agreement.

In this case, the Debtor contends that any alleged breach of

contract that it committed is insulated from attack because the members paid the purportedly unauthorized charges, and then used the Club Property.  In essence, the Debtor argues that by paying purportedly unauthorized fees, the members agreed to a modification of their contract with the Debtor, i.e., the members agreed to be charged dues that were not related to the operation of the Club Property as set forth in the Easement, Declaration, and Rules. Even assuming that principles of quasi estoppel are applicable notwithstanding the existence of a valid contractual relationship, quasi estoppel would only prevent the members from recovering legitimate fees paid to the Debtor.  The equitable remedy of quasi-estoppel was not intended to shield a party from its own alleged, wrongful breach of contract.  See Beam v. Wright, 32 S.E.2d 213, 218 (N.C. 1944) ("[I]t is generally held that equitable relief . . . will be withheld from those who are themselves guilty of wrongful conduct with respect to the transaction in which it is invoked.").  While a party may waive a breach of contract by making or accepting payment[5], the record in this case is insufficient for the court to conclude as a matter of law that a waiver has occurred.

B. Dining Room Minimums

The claimants seek to recover charges that the Debtor assessed

---

[5]See Fairchild Realty Co. v. Spiegel, Inc., 98 S.E.2d 871 (N.C. 1957).

against them for dining room minimums when the claimants did not partake of the Debtor's food and beverage service. The claimants do not dispute that the Declaration authorized the Debtor to maintain a food and beverage service on the Club Property; rather, the Claimants contest the expense associated with the food and beverage service that the Debtor chose to offer inasmuch as the claimants assert that they were subsidizing a for-profit venture of the Debtor. Similar to the imposition of membership dues, the only restrictions on the Debtor's setting a fee for dining room minimums was that the fee had to be based on the annual budget, and be related to the cost experience of maintaining the Club Facilities in a first class manner. For the reasons previously discussed regarding the claim for overpayment of dues, factual issues are raised regarding this portion of the claims asserted by the claimants, rendering summary judgment inapplicable.

C. Membership Fees

The claimants allege that the Debtor should return their respective $10,000 membership fees as a result of the Debtor's sale of the property and the rejection of the Rules. The Debtor contends that membership in the Club continues unabated and therefore nothing is owed. The court agrees with the Debtor.

The right of a lot owner to be a member of the Club at Longleaf is a right that arises out of the Easement and Declaration – the right to be a member is not based on the Rules,

which concern whether or not a member is in good standing. The right to be a member of the Club at Longleaf is a real covenant that runs with the land because the right to access the Club Property enhances the value of the residential lots, and decreases the value of the Club Property inasmuch as the use of that land is restricted. E.g., Runyon v. Paley, 416 S.E.2d 177, 183 (N.C. 1992) ("A restrictive covenant is a real covenant that runs with the land of the dominant and servient estates only if (1) the subject of the covenant touches and concerns the land, (2) there is privity of estate between the party enforcing the covenant and the party against whom the covenant is being enforced, and (3) the original covenanting parties intended the benefits and the burdens of the covenant to run with the land."). As evidenced by the Easement and Declaration, the original contracting parties intended the benefits and burdens to run with the land. Privity of estate exists between the lot owners and the new owner of the Club Property, Longleaf Florida, LLC, because in the December 24, 2004 sale order, the court found that the sale was subject to the rights of the members as created in the Easement and the Declaration. Accordingly, the members have not suffered any loss of their membership fees and summary judgment may be granted in favor of the Debtor on those claims.

## CONCLUSION

The court will deny the Debtor's motion for summary judgment

with regards to the members' claims to recover payments made for monthly membership dues and for dining room minimum charges.  The court will grant the Debtor's motion for summary judgment regarding the members' claims to recover their respective membership fees.

A separate order will be entered pursuant to Fed. R. Bankr. P. 9021.

                      PARTIES TO BE SERVED


John A. Northen, Esq.
Stephanie Osborne-Rodgers, Esq.
P.O. Box 2208
Chapel Hill, NC 27514-2208

Christine L. Myatt, Esq.
David Yarbrough, Esq.
P.O. Box 3463
Greensboro, NC 27402

Michael D. West, Bankruptcy Administrator

Sara A. Conti, Trustee

Ted & Velma Buschman
163 Hunter Trail
Southern Pines, NC 28387

William & Justine LaPorte
189 Hunter Trail
Southern Pines, NC 28387

Oscar & Joan Bell
319 Magnolia Circle
Southern Pines, NC 28387

Dennis & Carol Crook
313 Magnolia Circle
Southern Pines, NC 28387

Douglas & Ann Tobin
167 Hunter Trail
Southern Pines, NC 28387

Ann & David Thornton
2 Hunter Court
Southern Pines, NC 28387

Jim & Jean Walker
134 Hunter Trail
Southern Pines, NC 28387

Jim & Kay Gumbleton
233 Knoll Road
Southern Pines, NC 28387

Bud & Anne Hohn
277 Knoll Road
Southern Pines, NC 28387

Dan & Karol Burns
229 Hunter Trail
Southern Pines, NC 28387

Barbara J. O'Rand
104 Belmont Court
Southern Pines, NC 28387

William P. Elliott, Jr.
P.O. Box 1332
Pinehurst, NC 28370

Diane Norman
110 Paddock Lane
Southern Pines, NC 28387

Robert & Nancy Jacobs
16 Hunter Circle
Southern Pines, NC 28387

Richard & Marie Winterberg
22 Hunter Court
Southern Pines, NC 28387

Rod & Lois Harding
69 Paddock Lane
Southern Pines, NC 28387

Rudy & Barb Carlson
239 Knoll Road
Southern Pines, NC 28387

Howard & Ruth Danks
115 Triple Crown Circle
Southern Pines, NC 28387

Vince & Darlene Luppino
100 Paddock Lane
Southern Pines, NC 28387

David & Nancy Foote
118 Steeplechase Way
Southern Pines, NC 28387

Louis & Marilyn White
212 Starland Lane
Southern Pines, NC 28387

Ron & Lucie Saylor
178 Starland Lane
Southern Pines, NC 28387

Paul F. Biscardi
4 Tremont Street
Newburyport, MA 01959

George & Merlyn Smith
19851 Annenburg Drive
Ashburn, VA 26147

Pam Fairclough
233 West 99th Street, Apt.. 7B
New York, NY 10025-5017